(C. D. 1165)

MAYWOOD CHEMICAL WORKS  
MONSANTO CHEMICAL CO. } $v.$ UNITED STATES

United States Customs Court, Third Division

(Decided March 17, 1949)

*Lamb & Lerch (John G. Lerch* and *David N. Golden* of counsel) for the plaintiffs.  
*David N. Edelstein,* Assistant Attorney General (*Harold L. Grossman* and *Charles J. Miville,* special attorneys), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges

CLINE, Judge: These are protests against the collectors' assessments of duty on merchandise described in the invoices as "cocoa residue" at three-tenths of 1 cent per pound under paragraph 730 of the Tariff Act of 1930, as vegetable oil cake, not specially provided for. It is claimed in both protests that the merchandise is properly dutiable as waste at 7½ per centum ad valorem under paragraph 1555, as modified by the trade agreement with Canada, T. D. 49752, the trade agreement with the United Kingdom, T. D. 49753, and the trade agreement with Mexico, T. D. 50797. In protest No. 110992–K, it is also claimed in the alternative that the merchandise is properly dutiable as a nonenumerated unmanufactured article at 10 per centum ad valorem under paragraph 1558. That claim was not pressed at the trial.

The pertinent provisions of the tariff act are as follows:

PAR. 730. Bran, shorts, by-product feeds obtained in milling wheat or other cereals, 10 per centum ad valorem; hulls of oats, barley, buckwheat, or other grains, ground or unground, 10 cents per one hundred pounds; dried beet pulp, malt sprouts, and brewers' grains, $5 per ton; soy bean oil cake and soy bean oil-cake meal, three-tenths of 1 cent per pound; all other vegetable oil cake and oil-cake meal, not specially provided for, three-tenths of 1 cent per pound; mixed feeds, consisting of an admixture of grains or grain products with oil cake, oil-cake meal, molasses, or other feedstuffs, 10 per centum ad valorem.[1]

---

[1] Some of the rates of duty in paragraph 730 have been changed by subsequent trade agreements, but such changes are not here pertinent.

PAR. 1555 [as modified by the trade agreement with Canada, T. D. 49752, the trade agreement with the United Kingdom, T. D. 49753, and the trade agreement with Mexico, T. D. 50797]. Waste, not specially provided for, 7½ per centum ad valorem.

At the trial Gregoire Karch, purchasing agent of the Maywood Chemical Works, and Benjamin E. Thomas, production manager of Monsanto Chemical Co., testified that the merchandise herein was imported for the extraction of theobromine and was so used by their respective firms, and that the residue left after the said extraction was sold as fertilizer material.

A sample representative of the merchandise was received in evidence as plaintiffs' illustrative exhibit A, and the official sample in protest No. 110992–K was received in evidence as defendant's exhibit 3. A United States Customs Laboratory report of the merchandise in protest No. 113557–K was introduced into evidence as plaintiffs' exhibit 2. It states that the sample submitted was "cocoa press cake containing 1.5% fat and 2.7% theobromine." Plaintiffs' exhibit 5 is a United States Customs Laboratory report of the merchandise in protest No. 110992–K, stating that the sample contained "2.1% theobromine, and 0.4% petroleum ether extract (chiefly fat)."

Two witnesses described the process of manufacture of cocoa residue; Mr. Thomas, and Theodore R. Banks, director and chief chemist of Hershey Estates and manager of the Soap and Extraction Division. Mr. Thomas testified that cocoa residue is the material left over after cocoa beans have been pressed in specially designed machines for the removal of cocoa butter. He described the process as he had seen it in England as follows: Roasted or unroasted cocoa beans are cracked in specially designed milling machines, after which they are put through a winnowing machine, where nearly all of the shells are removed; the resultant material is called cocoa nibs; the nibs are preheated and passed to specially designed machines known as expellers, which press the butter from the beans and expel the material in question, which is known as cocoa residue.

On cross-examination Mr. Thomas was shown a laboratory analysis of defendant's exhibit 3, showing that it contained 0.4 per centum petroleum ether extract, and the witness stated that the product therein described was known as defatted cocoa residue; that it was further processed by a solvent extraction method to remove the fat which was present when the material came from the expeller.

The witness testified further that there are two forms of cocoa residue, one containing fat and the other defatted; that the two are separate articles of commerce, are well-known in the trade, and are differentiated on trade contracts; that cocoa residue which has been put through an expeller machine contains from 9 to 16 per centum

fat; that in order to get it down to 1½ per centum fat, the solvent extraction method must be used.

Mr. Banks described the processing of cocoa beans in the Hershey plant as follows: The beans are roasted and the shells knocked off; then the interior portion is broken into small pieces known as nibs; the nibs are ground and may be used as baking chocolate; in order to make cocoa powder, part of the cocoa butter in the nib is pressed out, leaving cocoa butter for edible purposes and cocoa-pressed cake. The cocoa butter obtained in this process is used in making coatings for candies and the cocoa-pressed cake is made into cocoa powder or breakfast cocoa. In the production of these chocolate products, a portion of the material, which is fibrous, is screened out and is refuse.

The witness stated that material like plaintiffs' illustrative exhibit A and defendant's exhibit 3 is the result of processing the broken beans, pieces of shell, bits of dust, and other refuse thrown off in the manufacture of cocoa butter and chocolate; that such material is gathered up and put through an expeller machine, leaving cocoa butter and expeller cake; that the cocoa butter obtained in this process is not edible and is used for soap; that the expeller cake has a fat content of 10 to 12 per centum; that if the broken beans and other refuse are put through a solvent extraction process instead of an expeller machine, the cocoa residue will have a fat content of 1, 2, or ⁵⁄₁₀ per centum. The witness indicated that cocoa residue might result from another process, that is, where the manufacturer is interested in obtaining cocoa butter alone. The material that remains in that instance is not cocoa powder, but inedible cocoa residue which contains about 1 per centum fat.

Reinhard S. Wobus, manager of the Norfolk plant of Monsanto Chemical Co., testified that the principal product of the plant is theobromine, which is obtained from cocoa residue; that cocoa residue containing only 1.5 per centum cocoa fat must have been obtained through the solvent extraction method; that the residue remaining after going through an expeller machine would have a fat content of 6 per centum or over; that for the operation of his plant he prefers merchandise with a low fat content and a high theobromine content; that theobromine is used as a medicinal; that he knows of no other use for cocoa residue except as fertilizer; that it has been used as fertilizer for many years; that the recovery of theobromine is a new development, relatively speaking.

Mr. Banks stated that cocoa residue from the Hershey plant was either used for the extraction of theobromine or sold to fertilizer manufacturers; that the material remaining after the extraction of theobromine was sold to the fertilizer industry; that it could not be used for cattle feed because lime is added in the extraction process. Mr.

Thomas testified that the price of cocoa residue is predicated upon the percentage of theobromine contained therein; that it is desirable that it have the lowest possible fat content, but that is not absolutely necessary.

Herbert A. C. Rauchfuss, a member of the firm of Woodward & Dickinson, Inc., testified that his firm had dealt in cocoa residue since 1928 and had sold it for fertilizer purposes only.

The following witnesses described experiments they had conducted in feeding cocoa residue to cattle, hogs, and poultry: Dr. Herbert J. Smith, director of research of the Ralston Purina Co.; Dr. Howard Bowman Ellenberger, professor of animal and dairy industry in the Experiment Station of the University of Vermont; and Mr. Banks. The results of these experiments, according to these witnesses, showed that cocoa residue was not palatable and was indigestible; that it decreased the digestibility of other food nutrients; that it resulted in a drop in milk production; that it tended to increase slightly the fat percentage in milk but a smaller quantity was produced; that it produced scours and had a laxative effect causing the animal to go off its feed; that it had a deleterious effect on pigs; that it reduced the egg production of poultry; that the ill effects were caused by the theobromine content. The witnesses concluded that cocoa residue was not a desirable ingredient in livestock or poultry feed. Dr. Smith stated that it was not approved as a feed ingredient by the American Association of Feed Control Officers and that most States would not accept registration of a feed containing an ingredient not approved by the Association.

Plaintiffs claim that the merchandise is not dutiable under paragraph 730 as vegetable oil cake on the ground that it cannot be used for animal feed and that Congress intended only those materials which are suitable for use as feed to be included thereunder. The first question is therefore the construction of paragraph 730.

Paragraph 730 enumerates a number of items, some of which are specifically designated as feeds. The Summary of Tariff Information, 1929, contains the following statements in regard to this paragraph (pp. 1210, 1213):

Description and uses.—The by-products of milling, such as bran, shorts, middlings, and the by-products of other manufacturing operations as dried beet pulp, malt sprouts, and brewers' grains (dried) are used chiefly as feed for animals. Hulls are used as a filler or roughener in some grades of feed for livestock.

\* \* \* \* \* \* \*

Competitive conditions.—Competition from imported mill feed is strongest in New England, where the dairy industry is a heavy buyer of feed stuffs, because it is closer to Canadian producers and to milling-in-bond operations at Buffalo than it is to Minneapolis, the center of hard spring wheat milling.

In *Mary G. Ricks* v. *United States*, 33 C. C. P. A. 1, C. A. D. 308, paragraph 730 is designated as the "so-called feed paragraph" (p. 10).

It is clear that the "Bran, shorts, by-product feeds obtained in milling wheat or other cereals" enumerated in paragraph 730 are feedstuffs. The "hulls of oats, barley, buckwheat, or other grains" provided for are those used for feeds, since oats, barley, and buckwheat for human consumption are specially provided for in paragraphs 726, 722, and 723. The next items are "dried beet pulp, malt sprouts, and brewers' grains." Sugar beets are provided for in paragraph 766 and beets for human consumption are covered by the general vegetable paragraphs, 774 and 775. Malt extract is provided for in paragraph 805; barley malt is in paragraph 722; and rye malt in paragraph 728. The malt sprouts mentioned in paragraph 730 are produced in malt-making operations and are used as animal feed. See *Mary G. Ricks* v. *United States, supra,* and *Ralph Boone* v. *United States,* 19 Cust. Ct. 62, C. D. 1068. The next item includes "soy bean oil cake and soy bean oil-cake meal." Soy beans are provided for in paragraph 762; soy beans, prepared or preserved in any manner, in paragraph 775; and soy-bean oil in paragraph 54. The soy bean oil cake and oil-cake meal provided for in paragraph 730 are thus not the products of soy beans which are used for human consumption, but those used for animal feed. The last group in paragraph 730 consists of "mixed feeds, consisting of an admixture of grains or grain products with oil cake, oil-cake meal, molasses, or other feedstuffs."

Thus all of the items in paragraph 730 are products ordinarily used for animal feed. The language of the provision for mixed feeds is an indication that Congress thought of oil cake and oil-cake meal as a feedstuff.

The Summary of Tariff Information, 1929, contains the following statement in regard to oil cake and oil-cake meal (p. 2467):

**Description and uses.**—The process of crushing vegetable seeds and nuts to extract the oil, leaves a compressed mass known, when unground, as oil cake and when ground, as oil-cake meal. In the United States this residual cake is chiefly derived from cottonseed, flaxseed, and copra. Smaller quantities are obtained from corn, soya beans, and peanuts. *It is not only a valuable feedstuff for dairy, and other livestock, and for poultry, but in certain foreign countries it is also an important fertilizer.* Oil cake enters extensively into international trade. [Italics supplied.]

Under the Tariff Act of 1922, oil cake and oil-cake meal were entitled to free entry (paragraph 1629), but from the above statement and a similar statement in the Summary of Tariff Information, 1921 (p. 1383), it is apparent that the products Congress had in mind were those used as feed or as fertilizer. In the Tariff Act of 1930, oil cake and oil-cake meal *eo nomine* were removed from the free list. However, whenever such merchandise is chiefly used for fertilizers or as an ingredient in the manufacture of fertilizers, it would be entitled to free entry under paragraph 1685. Vegetable oil cake and oil-cake meal used as feed is provided for under paragraph 730.

Dictionary definitions also indicate that the term "oil cake" is applied to the residue left after extracting oil from seeds which is used as a stock feed or as fertilizer.

Funk & Wagnalls New Standard Dictionary:

The mass of compressed seeds or the like from which oil has been expressed, used for cattle-food or as a fertilizer.

Webster's New International Dictionary, 2nd edition:

The solid mass, or residue, left after extracting most of the oil from seeds of cotton, hemp, flax, soybeans, etc., or from dried coconut meat, etc., used, esp. after grinding and then called oil meal, as a stock feed and some kinds as fertilizer; specif. linseed, or flaxseed, cake.

The New Century Dictionary:

A cake or mass of linseed, cotton-seed, etc., from which the oil has been expressed, used as a food for cattle or sheep, or as manure.

Encyclopaedia Britannica:

A feeding-stuff of great value, prepared from the residue resulting from the crushing of various oil-seeds.

New International Encyclopaedia:

The residue which remains in the press when seeds are crushed to express the oil which they contain. The term is often applied specifically to mean linseed cake. Oil cake still retains a portion of the oil of the seed, along with almost all its other constituents, and is valuable either for feeding cattle or for manure. * * *

See also *United States* v. *Wilfred Schade & Co.*, 16 Ct. Cust. Appls. 366, T. D. 43092, and definitions there set forth.

From this we conclude that oil cake is something used as feedstuff or as fertilizer. When used as feedstuff, it is provided for in paragraph 730, and when chiefly used as fertilizer, under paragraph 1685. A product used for neither purpose is not oil cake within the common meaning of the term nor within the meaning of the tariff act.

The record in the instant case shows that cocoa residue is not suitable for feeding livestock or poultry; therefore, it is not classifiable under paragraph 730, and since it is not chiefly used for fertilizer, it does not fall within the provisions of paragraph 1685.

Plaintiffs claim that the merchandise is properly dutiable as a waste, not specially provided for, under paragraph 1555, as modified by certain trade agreements. "Waste" within the meaning of the tariff act has been defined as follows (*Harley Co.* v. *United States*, 14 Ct. Cust. Appls. 112, 115, T. D. 41644):

In the tariff sense, waste is a term which includes manufactured articles which have become useless for the original purpose for which they were made and fit only for remanufacture into something else. It also includes refuse, surplus, and useless stuff resulting from manufacture or from manufacturing processes and commercially unfit, without remanufacture, for the purposes for which the original material was suitable and from which material such refuse, surplus, or unsought residuum was derived. * * *

In *Willits & Co.* v. *United States*, 11 Ct. Cust. Appls. 499, T. D. 39657, it appeared that in the operation of meat-packing houses, there remained a considerable amount of refuse meat which could not be used as material in the ordinary operations of such a plant. However, it contained a substantial proportion of grease or tallow which was recovered by cooking the material and subjecting it to powerful hydraulic pressure. The substance remaining after the grease was extracted was in the form of large compacted cakes and was sold for use as chicken feed. The court held it to be dutiable as waste, not specially provided for, stating (p. 501):

\* \* \* The imported article, in fact, is refuse which is left over in the meat-packing industry; it is a material which is not susceptible of being used in the ordinary operations of a packing house; it is a final residuum remaining after all of the valuable elements for packing purposes have been extracted from it; it is not an article which is sought or purposely produced as a by-product in the industry; to the contrary, it is reduced in quantity to the lowest possible minimum as an unsought residuum; it has lost the quality and utility of meat both as a raw material and as a finished product, and the use to which it is finally put is foreign to the ordinary use of either raw or preserved meat.

*Masson* v. *United States*, 15 Ct. Cust. Appls. 78, T. D. 42157, involved merchandise known as cottonseed pitch or distilled stearine pitch. It was made from black cotton grease, a residue from milling processes in making cottonseed oil. The black grease was processed for the purpose of recovering fatty acids or soap stock, the residue being the imported merchandise, which was used in the manufacture of flexible conduit compounds, battery cell compounds, paints, varnishes, and roofing material. The court held it to be waste, stating that it was no longer black grease, nor was it fatty acid, nor could it be used for any of the purposes that any of the things from which it came were suitable. The court stated further that it could not declare a thing not to be a waste, which was, in fact, a waste under recognized definitions, solely on account of its value.

In *Cia. Algodonera* v. *United States*, 23 C. C. P. A. 42, T. D. 47686, the issue involved the classification of cottonseed hulls. The process of production was described as follows (p. 43):

\* \* \* The ordinary oil mill procedure is, the first thing that is received from the cotton gin is cleaned, the dirt is sifted out mostly through screening; then the part of the lint is removed from that, on the linting machine. Then they go through what is known as hulling and separating. They cut the seed all up fine and they go through a separating machine, which separates the inside granule, which contains the oil from the outer shell, which is called the hull. That is the procedure up to the point of the hulls production.

The court held the merchandise properly classifiable as waste, stating (p. 45):

\* \* \* The cottonseed hulls are a by-product of the oil mills, necessarily produced in such oil mill operations. The fact that they are a valuable product,

and are a distinct commercial entity, does not militate against the view that they are, in a tariff sense, waste.

The testimony in the instant case indicates that cocoa residue is produced in two different ways. In one process, described by Mr. Thomas, cocoa nibs are passed through expeller machines which press out the cocoa butter, leaving the cocoa residue. In that case, cocoa butter is the product sought. In the other process, described by Mr. Banks, only part of the cocoa butter in the nib is pressed out, leaving cocoa-pressed cake, which is used in making cocoa powder. The broken beans, pieces of shell, and other refuse thrown off in this process are gathered together and put through the expeller machine which pressed out cocoa butter (which is inedible), leaving cocoa residue. In that case, the products sought are edible cocoa butter, cocoa, and inedible cocoa butter. There was further testimony to the effect that a defatted cocoa residue is produced where a solvent extraction process is used in place of the expeller machine. In such a case more cocoa butter is produced. The record shows also that the sought for products are chocolate, cocoa, and cocoa butter; that cocoa beans would not be processed for the purpose of producing cocoa residue; and that cocoa residue was formerly used for fertilizer only and is now used either to extract theobromine or for fertilizer.

To paraphrase the language in the *Willits* case, quoted above, cocoa residue is refuse which is left over in the production of cocoa butter or cocoa; it is not susceptible of being used in the ordinary operations of the cocoa or the cocoa butter industries; it is a final residuum remaining after all of the valuable elements for the production of cocoa and cocoa butter have been extracted; it is not an article which is sought or purposely produced as a byproduct in the industry; it is reduced in quantity to the lowest possible minimum as an unsought residuum; it has lost the quality and utility of cocoa or cocoa butter, and the use to which it is finally put is foreign to the ordinary use of either cocoa or cocoa butter.

The cocoa residue herein is a byproduct in the production of cocoa and cocoa butter, necessarily produced in such operation, as were the cottonseed hulls in *Cia. Algodonera* v. *United States, supra.* The fact that it is valuable because of its theobromine content does not indicate that it is not waste within the meaning of the tariff act.

For the foregoing reasons, we hold that the merchandise herein is properly dutiable as waste at 7½ per centum ad valorem under paragraph 1555 of the Tariff Act of 1930, as modified by the trade agreement with Canada, T. D. 49752, the trade agreement with the United Kingdom, T. D. 49753, and the trade agreement with Mexico, T. D. 50797. The protests are sustained and judgment will be rendered accordingly.